LEONARD K. THOMPSON v. WAKE COUNTY BOARD OF EDUCATION

No. 7610SC290

(Filed 17 November 1976)

1. Schools § 13— dismissal of career teacher — school board's participation in initial and final decisions — due process

Participation by the county board of education in both the initial decision to suspend a career teacher and the final decision as to dismissal of the teacher does not constitute a denial of the teacher's right to due process. G.S. 115-142.

Thompson v. Board of Education

2. **Schools § 13— teacher dismissal — participation by school board attorney — exchanges involving board members — due process**

A career teacher was not denied due process in a dismissal hearing before a county board of education by the participation in the hearing of the board's attorney rather than an attorney for the superintendent as permitted by G.S. 115-142(j)(3), or by exchanges at the hearing which involved members of the board.

3. **Schools § 13— teacher dismissal — review in superior court**

A dismissed school teacher is not entitled to a trial *de novo* in the superior court on the question of the truth or validity of the charges against him, and the action of the board of education will stand in the superior court unless the court finds one of the errors of law enumerated in former G.S. 143-315 (now G.S. 150A-51).

4. **Administrative Law § 4; Schools § 13— teacher dismissal proceeding — exemption from rules of evidence**

School boards acting pursuant to G.S. Ch. 115 were specifically excepted by former G.S. 143-317(1) from the general rule that the rules of evidence must be followed in administrative proceedings.

5. **Schools § 13— teacher dismissal proceeding — superior court review — consideration of evidence inadmissible in other proceedings**

Since school boards acting in teacher dismissal cases were not strictly bound by the rules of evidence, a reviewing superior court, in determining whether a board's determination was supported by competent, material and substantial evidence as required by former G.S. 143-315(5), could not exclude testimony from its consideration merely because it violated a rule of evidence.

6. **Schools § 13— teacher insubordination — acts contrary to accepted behavior standards**

Local school boards need not counsel teachers in advance against all possible types of misconduct before those teachers can be found guilty of insubordination, and repeated acts of teacher misconduct which are obviously contrary to accepted standards of behavior in the teaching profession and the community in general constitute insubordinate conduct.

7. **Schools § 13— teacher dismissal — insubordination — use of profanity — slapping, kicking, etc. of students — sanctioning card games in study hall — acts before teacher admonished**

A career teacher's use of "damn" and "hell" at various times in his classroom activities, his slapping, kicking, hair-pulling and "frogging" of students, and his sanctioning of card games in study hall did not constitute insubordination where there was no evidence that such acts were continued after the teacher was admonished or counselled to act differently. G.S. 115-142(e)(1)c.

8. **Schools § 13— teacher dismissal — immorality — obscene characterization of female student**

A career teacher's characterization of a female student as a whore did not constitute immorality within the purview of G.S. 115-142(e)(1)b.

Thompson v. Board of Education

**9. Schools § 13— teacher dismissal — allowing students to fight — neglect of duty**

The evidence supported a board of education's finding that a teacher on one occasion permitted two of his students to settle a dispute by fighting with each other, and such finding supported the board's dismissal of the teacher for neglect of duty relating to the encouragement of order and discipline. G.S. 115-142 (e) (1) d.

**10. Schools § 13— teacher dismissal — conduct insufficient to show lack of mental capacity**

Conduct of a school teacher in using profanity in classroom activities, slapping, kicking, and pulling the hair of students, sanctioning card games in study hall, allowing students to settle a dispute by fighting, and entering the girls' bathroom and seizing a student therein did not indicate a lack of mental capacity within the purview of G.S. 115-142 (e) (1) e.

Judge CLARK dissenting.

APPEAL by respondent from order of *Alvis, Special Judge*. Order entered out of session 8 December 1974 in Superior Court, WAKE County. Heard in the Court of Appeals 25 August 1976.

During the 1973-74 school year, Leonard K. Thompson (hereinafter called "petitioner") was employed by the Wake County Board of Education (hereinafter called "the board") as a public school teacher in the Apex Elementary School. At that time, petitioner had attained status as a career teacher as defined by G.S. 115-142. On 11 March 1974, the board by unanimous resolution suspended petitioner without pay and without a hearing on the grounds of (1) immorality, (2) insubordination, (3) neglect of duty, and (4) physical or mental incapacity.

Pursuant to G.S. 115-142 (h) (3), petitioner requested an investigation of the charges against him by a panel of the Professional Review Committee. The board submitted to the panel a list of "Grounds and Specifications" in justification of its suspension of petitioner. The specific charges were as follows:

"Leonard K. Thompson                          Grounds: IV

Charge: Physical or Mental Incapacity

*Specification 1:*

In that Leonard K. Thompson has engaged in such conduct, as set forth in the preceding charges and specifications, that if said conduct be not willful, the said Leonard K.

Thompson's physical or mental condition must be such as to render him incapable of control of himself and others about him, including students, and therefore in a condition of mental or physical incapacity (or both).

Leonard K. Thompson                                    Grounds: I

Charge: Immorality

*Specification 1:*

In that Leonard K. Thompson

(a) on or about February 21, 1974, communicated to Lorna J. Mann, a female child under the age of 16 years, indecent, insulting and obscene language, calling her a whore and making an obscene gesture to her; and

(b) on February 21, 1974, and on other occasions with respect to Lorna J. Mann and other female persons vocally used a term amounting to a charge of incontinent conduct, to wit: he called them 'little whores.'

*Specification 2:*

In that Leonard K. Thompson habitually during the 1973-74 school year has used in the presence of students at Apex Elementary School vulgar and obscene language not generally accepted in the community in which he was teaching and considered by the community to constitute immoral conduct.

*Specification 3:*

In that Leonard K. Thompson on various occasions has fondled and otherwise assaulted Johnnette Smith and other female and male children during duty hours at Apex Elementary School.

Leonard K. Thompson                                    Grounds: II

Charge: Insubordination

*Specification 1:*

In that Leonard K. Thompson during the 1973-74 school year failed to comply with instructions from the central

office of the Wake County Schools and from his principal with respect to:

(a) Refraining from assaulting children in the school;

(b) Refraining from use of profane, obscene, and vulgar language in the presence of the students;

(c) Attacking without cause students at Apex Elementary School.

*Specification 2:*

In that Leonard K. Thompson failed to maintain discipline in his classes and classroom in accordance with instructions from his superiors.

Leonard K. Thompson                            Grounds: III

Charge: Neglect of Duty

*Specification 1:*

In that Leonard K. Thompson failed to encourage good order and discipline in the Apex Elementary School, as required by NCGS 115-146, in 1973-1974.

*Specification 2:*

In that Leonard K. Thompson failed to discharge his duty during the 1973-74 school year at the Apex Elementary School insofar as encouragement of temperance and morality is concerned, against the form of the statute (NCGS 115-146)."

The panel met on 6 May 1974 and 16 May 1974 to investigate the matter and issued a report on 28 May 1974. In its report, the panel made findings of fact that the grounds for petitioner's dismissal were unsubstantiated by the evidence. The report also recommended, *inter alia,* that petitioner be reinstated with tenure, that petitioner be paid for the period of his suspension, that he be transferred to a new school, and that he be counseled to refrain from certain activities which had resulted in the charges against him.

Upon receipt of the report of the panel, the Superintendent of the Wake County Schools submitted to the board his written recommendation for dismissal of petitioner. The board, pursuant to G.S. 115-142 (i) (6), notified petitioner of the Super-

intendent's recommendation and scheduled a hearing for 15 July 1974, in the event petitioner wished to be heard on the matter. Petitioner requested the hearing pursuant to G.S. 115-142(i) (6). It began as scheduled and continued through five sessions, ending on 21 August 1974. Twenty witnesses were called and extensive testimony was taken. On 27 August 1974, the board issued a "Resolution" containing findings of fact and conclusions of law. The resolution concluded by ordering "that Leonard K. Thompson be and he is hereby dismissed as a teacher in the Wake County Public Schools on the grounds of immorality, insubordination, neglect of duty, and mental incapacity."

Pursuant to G.S. 115-142(n), petitioner appealed from this order of the board to the Wake County Superior Court. Upon reviewing the evidence, Alvis, Special Judge, entered an order on 8 December 1975, which reversed the resolution of the board and ordered that petitioner be reinstated as a career teacher in the Wake County Schools. It further ordered the board to pay petitioner all sums he would have received as compensation if he had not been discharged and had continued in employment as a teacher. The board appeals from the order of the Superior Court.

Other relevant facts are set out in the opinion below.

*Chambers, Stein, Ferguson and Becton, by Charles L. Becton, for petitioner appellee.*

*Boyce, Mitchell, Burns and Smith, by Eugene Boyce, for respondent appellant.*

MORRIS, Judge.

In the order of 8 December 1975, the Superior Court found as a "factual conclusion of law" that "the Wake County Board of Education, which was biased against Thompson, investigated, prosecuted and judged a cause against him, all in violation of due process as required by the current decisions interpreting constitutional guarantees." Thus the court appears to impugn both the impartiality of the board's decision as well as the statutory procedures by which the decision was reached. We do not agree that petitioner's constitutional rights were violated and shall discuss separately each aspect of the finding and our grounds for disagreement.

The more fundamental aspect of the finding of unconstitutionality involves the procedures set forth in G.S. 115-142. G.S. 115-142 represents a legislative attempt to provide the public school teachers of this State a greater amount of job security than had previously existed. *Taylor v. Crisp*, 21 N.C. App. 359, 205 S.E. 2d 102 (1974), *modified and aff'd.*, 286 N.C. 488, 212 S.E. 2d 381 (1975). The statute creates the status of "career teacher" to which various rights and privileges are attached. Perhaps the most important of these rights is that a career teacher may not be dismissed or demoted except upon specified grounds and in accordance with the statutory procedures provided.

The portions of G.S. 115-142 which are pertinent to this appeal are as follows:

"(e) Grounds for Dismissal or Demotion of a Career Teacher.—

(1) No career teacher shall be dismissed or demoted or employed on a part-time basis except for:

a. Inadequate performance;

b. Immorality;

c. Insubordination;

d. Neglect of duty;

e. Physical or mental incapacity;

f. Habitual or excessive use of alcohol or non-medical use of a controlled substance as defined in Article 5 of Chapter 90 of the General Statutes.

g. Conviction of a felony or a crime involving moral turpitude;

h. Advocating the overthrow of the government of the United States or of the State of North Carolina by force, violence, or other unlawful means;

i. Failure to fulfill the duties and responsibilities imposed upon teachers by the General Statutes of this State.

Thompson v. Board of Education

j. Failure to comply with such reasonable require-
ments as the board may prescribe;

k. Any cause which constitutes grounds for the
revocation of such career teacher's teaching
certificate; or

l. A justifiable decrease in the number of positions
due to district reorganization or decreased en-
rollment, provided that subdivision (2) is
complied with.

m. Failure to maintain one's certificate in a cur-
rent status.

\*   \*   \*

(f) Suspension without Pay.—If a board believes that
cause exists for dismissing a probationary or career teacher
for any reason specified in G.S. 115-142(e)(1)b through
115-142(e)(1)h and that immediate suspension of the
teacher is necessary, the board may by resolution suspend
him without pay and without giving notice and a hear-
ing . . . .

\*   \*   \*

(h) Procedure for Dismissal or Demotion of Career
Teacher.—

(1) A career teacher may not be dismissed, demoted
or reduced to part-time employment except upon the
superintendent's recommendation.

(2) Before recommending to a board the dismissal or
demotion of the career teacher, the superintendent shall
give written notice to the career teacher by certified
mail of his intention to make such recommendation
and shall set forth as part of his recommendation the
grounds upon which he believes such dismissal is justi-
fied. The notice shall include a statement to the effect
that if the teacher within 15 days after the date of
receipt of the notice requests a review, he shall be
entitled to have the proposed recommendations of the
superintendent reviewed by a panel of the Commit-
tee. . . .

(3) Within the 15-day period after receipt of the no-
tice, the career teacher may file with the superintend-
ent a written request for either (i) a review of the

superintendent's proposed recommendation by a panel of the Professional Review Committee or (ii) a hearing before the board within 10 days. . . .

(4) If a request for review is made, the superintendent, within five days of filing such request for review, shall notify the Superintendent of Public Instruction who, within seven days from the time of receipt of such notice, shall designate a panel of five members of the Committee (at least two of whom shall be lay persons) who shall not be employed in or be residents of the county in which the request for review is made, to review the proposed recommendations of the superintendent for the purpose of determining whether in its opinion the grounds for the recommendation are true and substantiated. . . .

(i) Investigation by Panel of Professional Review Committee; Report; Action of Superintendent; Review by Board.—

(1) The career teacher and superintendent will each have the right to designate not more than 30 of the 121 members of the Professional Review Committee as not acceptable to the teacher or superintendent respectively. No person so designated shall be appointed to the panel. . . .

(2) As soon as possible after the time of its designation, the panel shall elect a chairman and shall conduct such investigation as it may consider necessary for the purpose of determining whether the grounds for the recommendation are true and substantiated. . . .

(3) The career teacher and superintendent involved shall each have the right to meet with the panel accompanied by counsel or other person of his choice and to present any evidence and arguments which he considers pertinent to the considerations of the panel and to cross-examine witnesses.

(4) When the panel has completed its investigation, it shall prepare a written report and send it to the superintendent and teacher. The report shall contain an outline of the scope of its investigation and its finding as to whether or not the grounds for the recom-

mendation of the superintendent are true and substantiated. . . .

(5) Within five days after the superintendent receives the report of the panel, he shall submit his written recommendation for dismissal to the board with a copy to the teacher, or shall drop the charges against the teacher. His recommendation shall state the grounds for the recommendation and shall be accompanied by a copy of the report of the panel of the Committee.

(6) Within seven days after receiving the superintendent's recommendation and before taking any formal action, the board shall notify the teacher by certified mail that it has received the superintendent's recommendation and the report of the panel. . . .

(j) Hearing Procedure.—The following provisions shall be applicable to any hearing conducted pursuant to G.S. 115-142(k) or (1).

*    *    *

(3) At the hearing the teacher and superintendent shall have the right to be present and to be heard, to be represented by counsel and to present through witnesses any competent testimony relevant to the issue of whether grounds for dismissal or demotion exist or whether the procedures set forth in G.S. 115-142 have been followed.

*    *    *

(l) Panel Does Not Find That the Grounds for Superintendent's Recommendation Are True and Substantiated.—

(1) If the panel does not find that the grounds for the recommendation of the superintendent are true and substantiated, at the hearing the board shall determine whether the grounds for the recommendation of the superintendent are true and substantiated upon the basis of competent evidence adduced at the hearing by witnesses who shall testify under oath or affirmation to be administered by any board member or the secretary of the board.

(2) The procedure at the hearing shall be such as to permit and secure a full, fair and orderly hearing and

Thompson v. Board of Education

to permit all relevant competent evidence to be re-
ceived therein. The report of the panel of the com-
mittee shall be deemed to be competent evidence. A
full record shall be kept of all evidence taken or offered
at such hearing. Both counsel for the system and the
career teacher or his counsel shall have the right to
cross-examine witnesses.

*   *   *

(4) At the conclusion of the hearing provided in this
section, the board shall render its decision on the evi-
dence submitted at such hearing and not otherwise."

Thus a career teacher may not be dismissed except for the
grounds enumerated in subsection (e), and then only upon the
recommendation of the superintendent to the board. The teacher
must be notified of the superintendent's recommendation and
given the opportunity to request a hearing before the board
or a panel of the Professional Review Committee. If the board
believes that cause exists for dismissal under certain of the
grounds listed in subsection (e) (1), the teacher may be sus-
pended without pay and without notice and a hearing. The
teacher's recourse is then by means of a hearing before the
board or a panel of the Review Committee where the teacher
may have counsel, present evidence and cross-examine witnesses.
If the teacher requests a hearing before the panel and it finds
that the superintendent's charges are not true and substantiated,
the superintendent may either drop the charges or may again
recommend suspension to the board. Only if the recommenda-
tion is renewed by the superintendent at this point does the
matter come again before the board, which schedules a hear-
ing. The teacher is notified and given an opportunity to be
present, to be heard, to be represented by counsel and to pre-
sent competent testimony. The final decision is then given by
the board solely on the basis of the evidence presented.

[1]   Thus, when a teacher is suspended without pay and with-
out notice and a hearing, the board is involved in two steps of
the process: (1) in the determination that "cause exists" for
immediate dismissal and (2) in the final decision, either where
review is immediately requested by the teacher, or where the
superintendent renews his recommendation after exoneration
by the panel. In either case, both the initial decision to suspend
and the final disposition of the case rest with the board. Peti-
tioner contends, and the trial judge found, that participation

of the board in both stages of the suspension procedure consti-
tutes a denial of the teacher's right to due process. We dis-
agree.

Of course, "[a] fair trial in a fair tribunal is a basic re-
quirement of due process." *In re Murchison*, 349 U.S. 133, 136,
99 L.Ed. 942, 946, 75 S.Ct. 623, 625 (1955). This rule applies
equally to administrative agencies which have adjudicatory
functions as well as to the courts. *Gibson v. Berryhill*, 411 U.S.
564, 36 L.Ed. 2d 488, 93 S.Ct. 1689 (1973). However, mere famili-
arity with the facts of a case gained by an agency in the per-
formance of its statutory duties does not disqualify it as a
decisionmaker. In *FTC v. Cement Institute*, 333 U.S. 683, 92
L.Ed. 1010, 68 S.Ct. 793 (1948), the Federal Trade Commission
investigated the pricing system of the respondent and reported
its findings to the Congress and the President. Certain members
of the Commission had expressed the opinion that the pricing
system was illegal. When the Commission subsequently insti-
tuted formal proceedings, the respondent insisted that the Com-
missioners disqualify themselves ". . . on the assumption that
such an opinion had been formed by the entire membership
of the Commission as a result of its prior official investiga-
tions." 333 U.S. at 700, 92 L.Ed. at 1034, 65 S.Ct. at 803. In
rejecting this contention, the Supreme Court held that the fact
that the Commission formed opinions as the result of its prior
investigations did not mean that their minds were irrevocably
closed on the subject. The Court also stated:

> "[No] decision of this Court would require us to hold that
> it would be a violation of procedural due process for a
> judge to sit in a case after he had expressed an opinion as
> to whether certain types of conduct were prohibited by law.
> In fact, judges frequently try the same case more than
> once and decide identical issues each time, although these
> issues involve questions both of law and fact. Certainly,
> the Federal Trade Commission cannot possibly be under
> stronger constitutional compulsions in this respect than
> a court." *Id.* at 702-03, 92 L.Ed. at 1035, 68 S.Ct. at 804.

*Withrow v. Larkin*, 421 U.S. 35, 43 L.Ed. 2d 712, 95 S.Ct.
1456 (1975), involved the medical licensing board of Wisconsin,
which was empowered by statute to warn and reprimand a
physician, temporarily suspend his license, and begin criminal
or suspension proceedings against him. When the board began

investigating the plaintiff-physician, he brought suit to enjoin the board from conducting both an investigation and a subsequent hearing based on the investigation. The Supreme Court reaffirmed its *FTC* rule and held that the procedure by which the licensing board investigated and adjudicated the physician's case did not violate due process.

We find the recent case, *Hortonville Joint School District v. Hortonville Educational Assoc.,* 426 U.S. 482, 49 L.Ed. 2d 1, 96 S.Ct. 2308 (1976), to be particularly analogous to the case at hand. In *Hortonville,* respondent-teachers had taught in petitioner-school district, but the parties were unable to come to terms over a new contract. The teachers subsequently went on strike in direct violation of Wisconsin law. After repeated attempts to get the teachers back to work, the School Board began disciplinary hearings against them and subsequently voted to terminate the employment of those still on strike. The teachers filed suit alleging that the termination hearing was constitutionally inadequate, because the Board was biased as a result of the heated contract dispute. The Supreme Court held that the School District could properly make the decision to terminate the teachers' employment and rejected the teachers' claim of bias, noting that ". . . the Board's prior role as negotiator does not disqualify it to decide that the public interest in maintaining uninterrupted classroom work required that teachers striking in violation of state law be discharged." 426 U.S. at 494, 49 L.Ed. 2d at 10, 96 S.Ct. at 2315. The Court went on to hold that:

> "Respondents have failed to demonstrate that the decision to terminate their employment was infected by the sort of bias that we have held to disqualify other decision-makers as a matter of federal due process. *A showing that the Board was 'involved' in the events preceding this decision, in light of the important interest in leaving with the Board the power given by the state legislature, is not enough to overcome the presumption of honesty and integrity in policymakers with decisionary power."* 426 U.S. at 496-97, 49 L.Ed. 2d at 11-12, 96 S.Ct. at 2316. (Emphasis supplied.)

Appellee contends, however, that the board is necessarily biased because it is in effect required to make the same finding twice. We disagree. In authorizing immediate suspension of

a teacher without pay, G.S. 115-142(f) requires only that the board find "that *cause* exists" for suspension under one of the enumerated grounds. Before final disposition of the matter, however, the board must provide the teacher with a full and formal hearing in accordance with traditional due process protections. Clearly, the standard applied by the board in each stage is different. Initially, the board, after investigation, need only find that cause exists to believe the teacher is guilty of misconduct; this is somewhat analogous to the finding of probable cause in a criminal case. The board does not reach the merits of the case until it holds its formal hearing where the teacher has the right to be present, represented by counsel, put on evidence and cross-examine witnesses. Thus, the board is performing two separate functions pursuant to G.S. 115-142. Accordingly, we believe, and so hold, that procedures provided by G.S. 115-142 do not violate the due process guarantees of the United States Constitution.

[2]   Petitioner further argues that, even if the procedures followed by the board are not unconstitutional *per se,* there are special facts and circumstances which amount to a due process violation in this case. In its order, the Superior Court agreed and cited the participation of the board's attorney in the hearing and certain exchanges which took place at the hearing as circumstances which resulted in bias toward petitioner. Admittedly, G.S. 115-142(j)(3) entitles the superintendent, and not the board, to be represented by counsel at the hearing. Yet the order does not specify how this participation prejudiced petitioner. In fact the order recites, "Of course, it would be unfair to say that [attorney] Davis worked Thompson's defeat, especially in consideration of a record that shows that in the volume his examination of witnesses on behalf of the Board is exceeded by that of the Board's members' examination of the witnesses." We have studied the entire record and find no evidence to support the contention that participation of the board's attorney resulted in biasing the board or prejudicing petitioner in any manner. As for the exchanges which occurred at the hearing, we recognize that in any hearing the trier of fact may form certain opinions on the facts thus far presented; this is his function. Also, pointed questions are often necessary to reach the truth on a given issue. We have examined these remarks in the context of the full hearing and do not find any evidence of actual bias of any members of the board. Since there was no prejudice to petitioner resulting either from the

procedures provided in G.S. 115-142 or from the events which transpired at the hearing, the order's "factual conclusion of law" relating to a denial of due process is overruled.

[3] Before considering the specific findings of Judge Alvis' order, we must first determine the proper scope of review in the Superior Court of a teacher dismissal proceeding. At the time of petitioner's hearing, the scope of judicial review of administrative decisions was set out in G.S. 143-315, repealed 1973 Session Laws, c. 1331, s. 2 (now G.S. 150A-51) which provides:

> "The court may affirm the decision of the agency or may remand the case for further proceedings or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>
> (1) In violation of constitutional provisions; or
>
> (2) In excess of the statutory authority or jurisdiction of the agency; or
>
> (3) Made upon unlawful procedure; or
>
> (4) Affected by other error of law; or
>
> (5) Unsupported by competent, material, and substantial evidence in view of the entire record as submitted; or
>
> (6) Arbitrary or capricious."

Clearly, petitioner was not entitled to a trial *de novo* on the question of the truth or validity of the charges against him. The action of the board will stand in the Superior Court unless it finds that one of the enumerated errors of law occurred. Petitioner contends that subsection (5) conclusively determines that the superior court may reverse if it finds the school board's decision is not supported by competent, material, and substantial evidence in the record as a whole. We believe, however, that G.S. 143-315(5) must be read in conjunction with the rules regarding the admission of evidence at teacher dismissal hearings.

[4] Generally, the rules of evidence must be followed in administrative proceedings. G.S. 143-318, repealed 1973 Session Laws, c. 1331, s. 2 (now G.S. 150A-29). However, school boards

---

Thompson v. Board of Education

---

acting pursuant to Chapter 115 of the General Statutes are specifically excepted from this general rule by virtue of G.S. 143-317(1), repealed 1973 Session Laws, c. 1331, s. 2. Instead G.S. 115-142(j)(2) sets out the applicable rules governing teacher dismissal proceedings.

> "The hearing shall be conducted in accordance with such reasonable rules and regulations as the board may adopt consistent with G.S. 115-142, or if no rules have been adopted, in accordance with reasonable rules and regulations adopted by the State Board of Education to govern such hearings."

As the board had no such rules and regulations at the time of petitioner's hearings, we are guided by the rules of the State Board of Education as adopted in its proposed resolution of 6 April 1972 (effective 1 July 1972):

> "(4) *Rules of Evidence.*—At any hearing conducted pursuant to G.S. 115-142(k) or G.S. 115-142(l), boards of education may admit any evidence and may give probative effect to evidence that is of a kind commonly relied on by reasonably prudent men in the conduct of serious affairs. Boards may in their discretion exclude incompetent, irrelevant, immaterial, and unduly repetitious evidence."

Thus, the board, unlike most other administrative agencies, was not strictly bound by the rules of evidence, although certain types of evidence could be excluded in the board's discretion.

[5] We believe the general guidelines for judicial review contained in G.S. 143-315(5) are modified by the evidentiary rules of teacher dismissal proceedings. Although the reviewing superior court must still look for substantial evidence in the record as a whole which is competent and material, it may not exclude testimony from its consideration merely because it would otherwise violate a rule of evidence. We shall now examine the board's resolution and the Superior Court's order in that light.

The board, in its resolution of 27 August 1974, made the following findings of fact:

> "[1] During the 1973-74 school year Charles D. Keck, the principal of the Apex Elementary School, directed Leonard K. Thompson not to administer corporal punishment

to any student without another member of the faculty or staff of the school being present. Mr. Keck also admonished Mr. Thompson not to use the terms 'damn' and 'hell' in instruction of and conversation with his students at school. The principal had a general directive against playing cards at school, and confiscated cards he found being used in card games at school.

[2] On January 24, 1974, Leonard K. Thompson, while on duty at Apex Elementary School, slapped Kathryn Elaine Novick, a female student, in the face after understanding her to say to him: 'Shut up, Mr. Thompson!' During the same episode Mr. Thompson pulled the hair of Tracy Byrd, another female student. No other member of the faculty or staff of Apex Elementary School was present at the time of the slapping or hair-pulling. The assistant principal of Apex Elementary School observed Mr. Thompson immediately after the incident 'hollering and yelling . . . about to have a fit.' Complaints were made and Mr. Thompson apologized to the parents of the two girls, but recited that he would slap the Novick child again if she told him to shut up.

[3] At various times during the 1973-74 school year Mr. Thompson, who weighs about 190 pounds, administered corporal punishment to male and female students by performing what he described as 'frogging,' resulting in one case on October 9, 1973, of (sic) injury and bruises to Robert Joseph Jungers, a male student weighing about 90 pounds. The 'frogging' of Jungers and other students was not accomplished in the presence of any other member of the faculty or staff of Apex Elementary School.

[4] During the 1973-74 school year Mr. Thompson allowed students in study halls over which he had supervision to play checkers, chess, and various card games including blackjack.

[5] On many occasions during the school year 1973-74 Leonard K. Thompson used the words 'damn' and 'hell' as part of his vocabulary in instruction of and conversation with his students at Apex Elementary School. The use of such terms by a teacher under such circumstances is considered by some members, if not the majority, of the Apex community as immoral conduct.

[6] On numerous occasions during the 1973-74 school year Leonard K. Thompson administered corporal punishment to students by kicking them, not in the presence of any other member of the faculty or staff of Apex Elementary School, including February 21, 1974, when he went into the girls' toilet in the school gymnasium, pulled out Lorna Mann, a female student, and kicked her. During a discussion of her conduct with Lorna Mann Mr. Thompson called her a whore. Earlier during the 1973-74 school year Mr. Thompson, in a conference with Morris Brown, had characterized a group of his female students as 'little whores.'

[7] On occasion during the 1973-74 school year Mr. Thompson allowed students under his supervision to settle disputes by fighting among themselves, and on one occasion allowed himself to engage in a slapping exchange with Cindy Yarborough, one of his students."

The Superior Court reviewed the findings as follows:

"Finding of Fact numbered '[1]' is not supported by any competent evidence of record.

Finding of Fact numbered '[2]' has supporting evidence for the first sentence. If the second sentence—'During the same episode Mr. Thompson pulled the hair of Tracy Byrd, another female student.'—is read only to ascertain a result it is supported by evidence, but if it is read to ascertain intent it is not supported by any competent evidence. The fourth sentence, that no faculty or staff member was present, is not supported by competent evidence. The fifth sentence, what the assistant principal observed, is an incorporation of inadmissible hearsay and conclusory evidence which was not responsive to a proper question. The concluding sentence finds evidentiary support in the record.

Finding of Fact numbered '[3]' as it relates to Robert Joseph Jungers is supported by evidence, otherwise the finding is itself conclusory.

Finding of Fact numbered '[4]' is supported by competent evidence. Finding of Fact numbered '[5],' first sentence, exclusive of the conclusory word 'many,' is supported by competent evidence. The second sentence, exclusive of the phrase 'if not the majority,' is not supported by any competent evidence. The excluded phrase 'if not the majority'

Thompson v. Board of Education

could have been found as a legitimate inference arising from a lack of competent evidence on the subject.

Finding of Fact numbered '[6],' first sentence, finds no evidentiary support for the conclusory word 'numerous' and the words 'kicking' and 'kicked' were contested at length on hearing to the end that the acts shown by the evidence warranted complete description rather than characterization. The witness Lorna Mann, a student, did testify that she ran out of a gym class and Thompson pursued her into the girls' bathroom, brought her back and kicked her. She also testified that Thompson called her a 'whore.' Morris Brown testified Thompson in a conversation between the two in Brown's office characterized some students as 'little whores.' Lorna Mann's testimony was clearly competent. Brown's less so.

Finding of Fact numbered '[7],' as it relates to allowing students to settle disputes by fighting is not supported by competent evidence—rather it appears to be the product of an erroneous deduction from some related evidence: an illegitimate inference. As to the incident with Cindy Yarborough, Johnette Smith's testimony is to the effect that she 'didn't know whether they [Thompson and Yarborough] were playing or not.'"

We shall now separately treat each of the findings in the order. Examination of the record reveals that Charles D. Keck, Principal of Apex Elementary School, testified that he met with petitioner at various times throughout the 1973-74 school year concerning petitioner's performance. The record is unclear as to what precisely transpired in these discussions, but Keck testified that he ". . . did counsel with Mr. Thompson about his use of vulgar and obscene language." Keck also stated that he ". . . had not authorized any teacher at Apex School to use those [study] periods for chess games or card games. I disapprove of that kind of thing and I have a drawer full of cards now that I would take." These facts were undisputed in the record. We are unable to find support in the record that petitioner was directed not to administer corporal punishment to any student unless another faculty member was present. However, the remainder of the board's first finding of fact is supported by substantial evidence which is both competent and material.

We agree with the trial judge that the record supports the board's second finding that petitioner slapped one female student and pulled the hair of another on 24 January 1974. The evidence on these incidents was virtually uncontroverted. Petitioner did not deny the incidents and recited that he would slap the Novick girl again in similar circumstances. The order's criticism of the portion of the finding as based on hearsay evidence is erroneous in view of the evidence which is properly admissible at a teacher dismissal hearing (supra). We agree that there is no support in the record for the board's finding that no faculty member was present when the slapping incident took place. This is, however, a minor error in what is otherwise a finding supported by substantial and competent evidence.

We agree with the Superior Court that findings 3 and 4 of the board are supported by the evidence.

We disagree with the order's review of finding of fact 5. At the hearing, Joe Jungers, one of petitioner's students, testified that "I have heard him [petitioner] use profane language in class. I heard him say 'Damn' and 'Hell.' He would use those expressions there sometimes during class when he would get mad at one or two of the kids." He also testified that, upon discovering a fight between two students, petitioner instructed one of them to ". . . beat the hell out of [the other]." Cathy Regan, another student, testified "I have occasionally heard Mr. Thompson use the word 'damn' and the word 'hell' in the classroom." A third student, Johnette Smith, stated that "the onliest words I heard him use was 'damn' and sometimes he would say 'hell,' when he was mad." Lorna Mann, another student stated "I have heard Mr. Thompson use the word 'Damn' in a class. I have heard him use the word 'hell' in a class. . . . I have heard him use the word 'Damn' a couple of occasions in class during class and study hall." On the question of what constitutes immoral or profane conduct in the Apex community, the board heard testimony from Mr. William J. Booth, Chairman of the Apex Advisory Council, a body which serves as a link between the school board and the citizens. In response to questions relating to the use of "hell" and "damn" in the classroom, Booth testified, "To my knowledge of the community, I would say that these type (sic) of language used in the classroom in Apex would be considered immoral. . . . I recognize the word 'damn' as profanity. . . . As to the word 'hell' other than use in religious type courses and referring to the below and above, I

would say this is profanity. I would say that it is the sentiment for a lot of people but to say for all, I cannot. . . . I feel this is the general community concept." Taking this testimony into account, we believe the board's finding No. 5 was supported by the record.

Most of the order's comments regarding finding of fact No. 6 are not pertinent to the true function of the Superior Court in reviewing the board's decision. The order correctly states that there was no evidence of "numerous" kicking incidents although Lorna Mann testified that petitioner kicked her on at least two different occasions. However, the other remarks in the court's order are addressed more to the credibility of the witnesses before the board than to the sufficiency of the testimony to support the finding. This clearly was not the function of the Superior Court. The Superior Court may not weigh the evidence and substitute its evaluation for that of the board. In so doing it exceeds its right of review. *Equipment Co. v. Johnson*, 261 N.C. 269, 134 S.E. 2d 327 (1964). We believe the board's finding No. 6 is supported by the record.

We disagree with the order's review of the board's finding No. 7. Joe Jungers testified "I know Mike Novick and Eddie Barker. I recall an occasion when they had a fight with each other. Mr. Thompson saw the fight. He did not stop it. Mike and Eddie were fighting and Mr. Thompson called to Mike and as he turned around he said 'beat the hell out of Eddie' and Eddie hit and Mike turned around and bashed the mess out of Eddie." Johnette Smith testified similarly that petitioner said, " 'Go ahead and beat the hell out of each other!' He didn't care. It was in a class." Therefore, we believe that the board's finding No. 7 was supported by competent evidence and was not, as Judge Alvis found, "the product of an erroneous deduction from some related evidence: an illegitimate inference."

Consequently we are left with the following facts which are supported in the record: that petitioner used the words "damn" and "hell" at various times in his classroom activities; that he called one of his female students a whore; that such language was considered vulgar and profane by many members of the Apex community; that he allowed students in his study halls to play checkers, chess and blackjack, despite his principal's general policy against card playing in school; that on 24

Thompson v. Board of Education

January 1974, petitioner slapped one student and pulled the hair of another; that this action was taken in anger; that on 9 October 1973, petitioner administered corporal punishment upon a male student by what is referred to in the record as "frogging"; that by engaging in "frogging," petitioner bruised and injured the student; that on 21 February 1974, petitioner pulled a female student out of the girl's bathroom and kicked her; and that petitioner had on one occasion permitted his students to settle a dispute by fighting with each other. With only minor variations, these facts were incorporated into the findings by the board. Therefore, except for the discrepancies which we noted above, it was error for Judge Alvis to rule, as he did, that they were not based on competent evidence.

We shall now examine the board's conclusions of law and the Superior Court's review of them. The resolution contained the following conclusions:

"[1] That Mr. Thompson's action in using the words 'damn' and 'hell' in instruction of and conversation with his students at Apex Elementary School is disapproved by the Wake County Board of Education but does not constitute beyond a reasonable doubt immoral conduct on his part; that his continued use of these terms after counseling did constitute insubordination.

[2] That Mr. Thompson's action in entering the girls' toilet and seizing Lorna Mann on February 21, 1974, constituted indiscreet but not necessarily immoral conduct.

[3] That Mr. Thompson's characterization of Lorna Mann and other female students under his supervision as whores was an imputation to them of incontinence and lack of chastity and, in the absence of knowledge of such incontinence or lack of chastity, constituted an immoral act, inimical to public welfare and contrary to accepted standards.

[4] That Mr. Thompson's actions in administering corporal punishment without the presence of another member of the faculty or staff, in slapping children, pulling hair, and 'frogging' them as punishment, and kicking students, without authority from his superiors and against their stated policy, constituted insubordination.

Thompson v. Board of Education

[5] That Mr. Thompson's actions in allowing his students to fight with each other and with him constituted neglect of duty insofar as encouragement of discipline and good order in accordance with NCGS 115-146 is concerned.

[6] That Mr. Thompson's allowing cards and other games to be played in his study halls, without permission of his principal and against stated school policy, constituted an act of insubordination.

[7] That the language and actions of Mr. Thompson during the 1973-74 school year demonstrated his lack of capacity to control his speech and conduct, and constitutes mental incapacity."

In reviewing the board's conclusions, Judge Alvis found that

"Conclusion of Law numbered '[1]' is not supported by facts found from competent evidence because there is absolutely no evidence of record, competent or incompetent, that Thompson's conduct was in contravention of any superior's directive to the contrary.

Conclusion of Law numbered '[2]' is in Thompson's legal favor.

Conclusion of Law numbered '[3],' solely as to Lorna Mann, is supported by her testimony alone (which is emphatically denied by Thompson), but the remainder of the conclusion is without support.

Conclusion of Law numbered '[4]' is totally without evidentiary support insofar as it speaks to contravention of 'stated policy,' and insubordination may not result from lack of authority unless action without authority has been prohibited which is not this case.

Conclusion of Law numbered '[5]' is not supported by a finding based on competent evidence. According to the competent evidence, Thompson did say to two students on one occasion that IF they could not settle their dispute otherwise that they should fight—they did not fight; he did not allow a fight.

Conclusion of Law numbered '[6]' is totally lacking in support in evidence. One is not insubordinate unless he

knows, or has reason to know, that his actions are in violation of his superior's directives. He need not guess or speculate as to the attitudes of his superior.

There was no stated school policy. Keck, the principal, did not testify that he had directed Thompson to the contrary.

Conclusion of Law numbered '[7]' is not supported by a finding based on competent evidence. It is a clear product of predisposition overlooking a nonsequitur.

Therefore, not a single Conclusion of Law relied upon by the Board in dismissing Thompson is supported by a finding of fact based on competent evidence, except the finding that he called Lorna Mann a whore which the Board inextricably combined with a finding from Brown's testimony concerning a private conversation he had (denied by Thompson) with Thompson in which the latter referred to some unidentified group of students as little whores. From this combined finding the Board concluded that Thompson acted immorally and in a fashion 'inimical to public welfare and contrary to accepted standards.' Such a conclusion could not rest solely upon evidence of the conversation with Brown. Nor can this court determine how much of the conclusion gained support solely from that finding. Therefore the entire conclusion is tainted and cannot stand."

The board contends that the Superior Court Judge erred in ruling that the board's conclusions were not supported by findings based on competent evidence. It claims that the court should not have reweighed the evidence and that if the board's conclusions were supported by sufficient evidence, they should withstand judicial review, provided no other provision of G.S. 143-315 is violated. We agree.

[6, 7] The board's first, fourth and sixth conclusions relate to insubordination and we shall discuss them together. Specifically, the board concluded that petitioner's continued use of "damn" and "hell," his slapping, kicking, hair-pulling, and "frogging" of students, and his sanctioning of card games in study hall was contrary to school policy and thus constituted insubordination. Judge Alvis overturned these conclusions due to lack of evidence that these acts were in contravention of a "stated policy" of the board. We agree. "Insubordination im-

ports a willful disregard of express or implied directions of the employer and a refusal to obey reasonable orders." *School District v. Superior Court,* 102 Ariz. 478, 480, 433 P. 2d 28, 30 (1967). It appears to us that it would be unrealistic to require local school boards to counsel teachers in advance against all possible types of misconduct before those teachers could be found guilty of insubordination, and that repeated acts of teacher misconduct which are obviously contrary to accepted standards of behavior in the teaching profession and the community in general should constitute insubordinate conduct. Further we find it difficult to believe that petitioner did not know, or should not have known, that his behavior violated the implied if not the express policies of the board. Nevertheless, while the record shows that petitioner's conduct was often highly questionable under the circumstances, there is no evidence that the acts here objected to were continued *after* petitioner was admonished or counselled to behave differently. Therefore, petitioner's conduct did not constitute insubordination within the meaning of G.S. 115-142(c), and Judge Alvis correctly overruled these conclusions of the board.

The board's second conclusion, which involved petitioner's entering the girls' bathroom and seizing a student from therein, found the petitioner free of immoral conduct in the incident. This finding has sufficient support in the record.

[8] The board's third conclusion found petitioner's characterization of a female student as a whore to be an immoral act, contrary to accepted community standards. Judge Alvis found that although there was competent evidence of the fact that petitioner did refer to the student in this manner, ". . . the remainder of the conclusion is without support." We agree. While we deplore petitioner's use of language in the presence of his students, we do not think that the language used in this case warrants a finding of immorality as contemplated by G.S. 115-142(e)(1)b. Therefore, this conclusion of law was properly overturned in the Superior Court.

[9] The board's fifth conclusion found petitioner's allowance of fighting constituted neglect of duty relating to the encouragement of order and discipline. The Superior Court, citing petitioner's version of the fighting incident, overturned this conclusion of the board because it was ". . . not supported by a finding based on competent evidence." We disagree. It was

not the function of the trial judge to weigh the credibility of the evidence but only to test its sufficiency. We have previously discussed the sufficiency of the testimony concerning the fight incident and believe that when the record is viewed in its entirety, there is competent evidence in it which supports this conclusion of law. Therefore, this conclusion should not have been overturned in the Superior Court.

[10] The board's seventh and final conclusion, which found that petitioner's acts showed mental incapacity, was correctly overturned by the Superior Court. Petitioner's conduct was not such as would indicate lack of mental capacity as that term has been legally defined and applied.

We are mindful of the fact that, in reversing the order of the Superior Court, we reinstate petitioner's dismissal based solely on his neglect of duty arising from his failure to maintain discipline and good order. While there may be those who would argue that the breakdown of classroom order and discipline should not form the basis for so drastic a remedy as a teacher dismissal, we must again state the role of this Court in reviewing a dismissal proceeding. It is our function to examine the whole record to determine whether there is substantial evidence on which the findings of the school board are based and whether the conclusions are based on such facts and are not contrary to law. If the school board's findings and conclusions are substantiated in this manner, its order should be affirmed, regardless of the number or nature of the offenses charged. Further, the record in this case clearly reveals that other incidents involving petitioner grouped under other charges and specifications could have also been included by the board in its specifications under the neglect of duty charge.

We, therefore, reinstate the dismissal of petitioner as ordered in the board's resolution of 27 August 1974. The order of the Superior Court is

Reversed.

Judge VAUGHN concurs.

Judge CLARK dissents.

Judge CLARK dissenting.

I regret that I am unable to agree with the majority opinion in this case. It is obviously based on a thorough analysis of the evidence. I do not voice extravagant forebodings but seek to mildly refute error. Since the majority opinion includes a detailed listing of unproved allegations and irrelevant findings, some comparison between innuendo and fact, between what was charged and that the majority upholds, is in order.

The Superintendent of Schools preferred four charges against petitioner to justify the immediate suspension without pay and the recommendation to fire: (1) mental incapacity, (2) immorality, (3) insubordination, and (4) neglect of duty. Mr. Thompson was not charged with "inadequate performance" under G.S. 115-142 (e) (1) a.

The Superintendent listed eight specifications under the four charges. The Board of Education held hearings on three occasions and the transcript of these hearings amounts to over 500 pages. The Board made seven findings of fact and reached seven conclusions of law. It found sufficient evidence to fire Mr. Thompson on all four grounds. Much time and effort were obviously spent in attempting to establish the charges against petitioner. After all was said and done and after all the unfounded accusations and evidence not remotely relevant to the charges have been disregarded, the majority sustains the firing of petitioner on the basis of a single incident, whose telling in the record on appeal takes approximately three pages out of 177 pages of testimony.

Since the reversal by the majority rests upon only one finding of fact and one conclusion of law, I will concern myself only with those parts of the order of the Superior Court. I might note that I would be inclined to treat more sympathetically other parts of the order of the Superior Court reviewing other findings of fact were they germane to the majority holding.

The majority has correctly stated the proper scope of review in the Superior Court to the extent that it holds that appellate courts do not sit to reweigh the evidence in a trial *de novo*. The majority errs in its interpretation and application

of the revelant review statute. G.S. 150A-51 (then G.S. 143-315) provides that the decision of the school board may be reversed if

> "[T]he substantial rights of the petitioners may have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>
> *   *   *   *
>
> (5) Unsupported by competent, material, and *substantial evidence in view of the entire record as submitted;* . . . " (Emphasis added.)

Our Supreme Court has clearly stated that under G.S. 150A-51 (then G.S. 143-315) "the 'whole record' test is applicable. . . . The 'whole record' test must be distinguished from the 'any competent evidence' standard." *Underwood v. Board of Alcoholic Control*, 278 N.C. 623, 629, 181 S.E. 2d 1, 5 (1971).

In determining the substantiality of evidence supporting a decision of the Board, under the whole record test, a reviewing court must take into account whatever in the record fairly detracts from the weight of the evidence. A decision of the Board cannot be upheld merely on the basis of evidence which in and of itself justifies the action, without taking into account contradictory evidence or evidence on which conflicting inferences could be drawn. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

The majority feels that the order of the Superior Court was based upon an unduly restrictive definition of "competent" evidence and that because *some* competent evidence was apparently disregarded by the court, its review of the record violated the statutory standard. While focusing on the supposed evidentiary errors of the reviewing court, the majority overlooks the fact that even with the inclusion of this "competent" evidence, the *entire record as submitted* does not support the action of the Board in firing petitioner.

Thus the majority may not properly sustain the decision of the Board because there is "any competent evidence" to support it. When the "whole record" test is applied, it becomes clear that the Superior Court did not, as stated by the majority, weigh the credibility of the evidence but properly reviewed the "entire record as submitted."

Using the "whole record" test for reviewing the decision of an administrative agency under G.S. 150A-51 it is appropriate to evalute the decision of the Board and the order of the Superior Court. The majority bases its reversal upon the portions of the Board's seventh finding of fact and fifth conclusion of law that pertain to the fight between Mike Novick and Eddie Barker. The Board found that "Mr. Thompson allowed students under his supervision to settle disputes by fighting among themselves" and concluded that this constituted neglect of duty.

The finding of the Board rested upon the testimony of two students, Joe Jungers and Johnette Smith. The majority opinion has quoted only portions of their relevant testimony as proof of "competent" evidence which Judge Alvis ignored. When the "whole record" is surveyed, a different picture emerges. Joe Jungers also testified that he was not in the immediate vicinity of the fight and that he was not in a position to know why the fight had started. ("I came in the class a bit late. I was sitting over there playing chess and they started fighting for some reason.") Nor did he know when Mr. Thompson entered the room because he was playing chess. He did not deny Mr. Thompson's version of the incident or state that he was sure he had heard everything that Mr. Thompson said. He merely said "That's all *I heard* said." (Emphasis added.) In short, Joe Jungers was not in a position to testify to the complete content of Mr. Thompson's remarks. At the least the whole record standard requires that all the evidence of a single witness be considered and, in the terms of *Universal Camera Corp.*, be evaluated by "taking into account evidence on which conflicting inferences could be drawn." It is consistent with the statements of Joe Jungers to conclude that his attention was drawn away from his chess game and to the fight by the noise and commotion and that only then did he see Mr. Thompson and hear what he was saying.

The quotation by the majority of the testimony of Johnette Smith is similarly selective. She testified more fully that

"He would *probably* be out of the room and they would be fighting. He would come in and *more than likely* he would look at them and he would *probably* tell them *more than likely,* say 'Go ahead and beat the hell out of each other!' . . ." (Emphasis added.)

I do not believe that such an unclear and inconclusive statement is a sufficient basis to uphold a man's firing. Applying the whole record test, I do not believe that the testimony of Joe Jungers, which itself revealed an insufficient opportunity to observe the entire incident and the testimony of Johnette Smith, which manifestly is unclear and inconclusive are "substantial in view of the entire record as submitted."

Finally, although I believe that the testimony of the two students alone does not rise to the level of "substantial," I believe this conclusion becomes even more apparent when petitioner's version is considered, as *Underwood* makes clear is proper. In that case, our Supreme Court held that the Superior Court had properly considered the licensee's evidence in reviewing an administrative decision to the extent it did not explicitly contradict that of the Board. There the Board had revoked a liquor license on the basis of evidence which showed there had been a fight on the licensee's premises. Petitioner did not dispute that the fight had taken place, but offered complementary evidence showing he had acted properly in the circumstances. On two other charges the Superior Court also properly considered the petitioner's testimony to the extent it did not explicitly contradict the Board's evidence.

Here petitioner's version is that he admonished the boys by telling them that animals settled their disputes by fighting and added sarcastically that if they couldn't settle their disputes with their brains then they should go ahead and beat the hell out of each other. This testimony does not explicitly contradict that of the students. Rather, as in *Underwood,* it complements the version presented by the agency. It provides the preface for the remarks heard by Joe Jungers when his attention was finally drawn to the fight. It was properly considered by the Superior Court under the "whole record" standard.

We do not sit to judge the wisdom of the legislature in extending the concept of tenure to secondary schoolteachers. The procedures and grounds for firing have been set by the proper constitutional body. Under G.S. 150A-51 the Superior Court may reverse a decision of the school board which is not supported by "material, competent and substantial evidence in view of the entire record as submitted." The majority has erroneously applied the "any competent evidence" test. For reasons already stated I do not believe that the few lines of

testimony by the two students are "substantial." When the petitioner's version is also considered, as is proper under the "whole record" standard, this conclusion is even more apparent.

Because I would affirm the order of the Superior Court on statutory grounds, I would not need to reach the constitutional question and therefore express no opinion on that issue.